UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2022

(Argued: January 10, 2023      Decided: August 22, 2023)

Docket No. 21-1439

————————————————

UNITED STATES OF AMERICA,
*Appellee*,

v.

MARK KRIVOI, AKA IGOR,
*Defendant-Appellant*,

RUSLAN REIZIN, AKA RUSSEL,
*Defendant.*[*]

————————————————

Before:      JACOBS, SACK, AND NATHAN, *Circuit Judges*.

Defendant-Appellant Mark Krivoi was convicted of, among other things, kidnapping and kidnapping conspiracy in violation of 18 U.S.C. § 1201 in the United States District Court for the Eastern District of New York (Vitaliano, *Judge*).  Krivoi argues on appeal that we must vacate these convictions because the victim's detention was too brief to constitute kidnapping under section 1201, because Krivoi lacked the intent required to violate section 1201, and because the district court violated his constitutional rights by preventing him from cross-examining the victim about any connections that the victim's family may have had to the Federal Bureau of Investigation.  For the reasons that follow, we disagree.  We therefore

AFFIRM the judgment of the district court.

———————————

[*]  The Clerk of Court is respectfully directed to amend the caption as set forth above.

RICHARD M. LANGONE, Langone &
Associates, PLLC, Garden City, NY, *for
Defendant-Appellant*;

JONATHAN SIEGEL (Susan Corkery and
Michael W. Gibaldi, *on the brief*), Assistant
United States Attorneys, *for* Breon Peace,
United States Attorney for the Eastern
District of New York, Brooklyn, NY, *for
Appellee.*

JACOBS and SACK, *Circuit Judges*:

Defendant-Appellant Mark Krivoi was convicted in the United States

District Court for the Eastern District of New York (Vitaliano, *Judge*) of

kidnapping and kidnapping conspiracy in violation of 18 U.S.C. § 1201, and

attempted extortion and extortion conspiracy in violation of 18 U.S.C. § 1951.[1]

Krivoi argues on appeal that we must vacate the kidnapping and kidnapping

conspiracy convictions because:  The victim's detention was too brief to

constitute kidnapping under section 1201; Krivoi lacked the intent required to

violate section 1201; and the district court violated Krivoi's constitutional rights

by preventing him from cross-examining the victim about any connections that

---

[1] The attempted extortion and extortion conspiracy convictions are not before us on appeal.

the victim's family may have had to the Federal Bureau of Investigation. For the reasons that follow, we affirm.

## BACKGROUND

### I.     Factual Background

Because Krivoi "appeals his convictions following a jury trial, 'our statement of the facts views the evidence in the light most favorable to the government, crediting any inferences that the jury might have drawn in its favor.'" *United States v. Dhinsa*, 243 F.3d 635, 643 (2d Cir. 2001) (quoting *United States v. Salameh*, 152 F.3d 88, 107 n.1 (2d Cir. 1998) (per curiam)).

Mark Krivoi's convictions arose from a series of events involving his cousin, Ruslan Reizen, who ran a Brooklyn-based power-washing company called Whiterock Cleaning Services.[2] In mid-2016, Reizen hired Daniil Buriev as a salesman for Whiterock "on one condition: that Buriev promise he would never steal Reizin's customers." Appellant's Br. at 2. A few months later, Buriev left Reizin's company to start his own store-front power-washing business. Buriev's business offered services similar to those that Reizin's company offered but often

---

[2] Buriev testified at trial that the company's name was "Whiterock Cleaning Services," Gov't's App'x at 3, but Krivoi refers to the company as "White Rock, Corp." in his brief, Appellant's Br. at 5.

at cut-rates.

Reizin eventually learned of Buriev's competing business. On May 22, 2017, he called Buriev, leaving at least two threatening voicemails. In the first, Reizin stated that he had "a big problem" with Buriev—"a serious situation";[3] the second demanded a call back lest Reizen "set [Buriev] up and create different problems." Gov't's App'x at 18. Buriev testified that the messages left him terrified. *See id.* ("[M]y hands were literally, like, shaking. I was really like scared, like just scared.").

Buriev's fear was reinforced by the fact that Reizin had previously told Buriev that Reizin had connections to a motorcycle gang called "Bratva." Gov't's App'x at 18–19. Buriev testified at trial that "Bratva" is Russian for "Brotherhood" and that Reizin had described it as a motorcycle gang that had "people who do the dirty job[s]." *Id.* at 6–7. Buriev understood Reizin to mean that Bratva had enforcers who used physical force on behalf of others.

Buriev nevertheless returned Reizin's calls later that day. During the course of one conversation, Reizin told Buriev that he had "a couple of . . .

---

[3] For convenience, this opinion will cite to the transcripts of Krivoi's trial that are contained in the government's appendix rather than to the transcripts directly. The transcripts can be accessed directly from the docket at Trial Trs., *United States v. Reizin*, 18-CR-100 (ENV), ECF Nos. 94–97.

crippled people like" Buriev and that Buriev and Reizin had "to meet and seriously resolve the issue, otherwise it w[ould] be real fucking horrendous." Gov't's App'x at 34; *see also id.* (Reizin: "I fucking respected you until now. Until you fucking started to steal from me in this way."). But Reizin also assured Buriev that he "just want[ed] to talk"; if Reizin had decided he had to cripple Buriev, Reizin "would have done it differently." *Id.*

Buriev and Reizin agreed to meet that evening at "Masal Cafe,"[4] Gov't's App'x at 35, a restaurant located on Emmons Avenue, the east-west highway that runs along the north side of the bay and through the Sheepshead Bay neighborhood in Brooklyn, New York. The neighborhood, located in the south of the borough, is on the north shore of a small Jamaica Bay/Atlantic Ocean inlet with the same name: Sheepshead Bay.[5] Reizin lived there, not far from the café.

Some hours before the meeting, Reizin called Krivoi, a cousin with whom he had once studied martial arts, and asked Krivoi to attend the meeting. At

---

[4] The restaurant's official name appears to be Masal Cafe & Lounge, but that name does not appear in the record, and the parties do not use it in their briefs.

[5] "Sheepshead Fish, also sometimes called Convict Fish, is a saltwater fish found along the Atlantic Coastline of North and South America." *Sheepshead Fish*, AZ ANIMALS (Sept. 26, 2022), https://a-z-animals.com/animals/sheepshead-fish/.

trial, a cell-site expert testified that the relevant records placed Krivoi's and Reizin's cell phones together on that day at about 11:00 AM at an address to which Krivoi had registered his truck on Flatlands Avenue, a street in Brooklyn that is north of Sheepshead Bay. Krivoi agreed to join Reizin's meeting with Buriev later that day.

That evening, Buriev went to Masal Cafe and waited inside for Reizin to show up. Reizin then drove his van to the café, with Krivoi following in a truck.

After Reizin arrived at Masal, he telephoned Buriev and told him to come outside. Buriev said that he did not feel safe going outside and asked Reizin to meet inside instead. Reizin declined, threatening that if Buriev did not come out, Reizin would come inside and "cut [Buriev's] neck." Gov't's App'x at 39.

Buriev reluctantly agreed. He left the restaurant and joined Reizin at his van. Reizin ordered Buriev to get in Krivoi's truck rather than the van. Despite never having met Krivoi before, Buriev followed Reizin's orders and walked to the truck: Buriev asked to sit in the passenger seat. Without otherwise responding, Krivoi moved a stack of papers from the front seat to the back so that Buriev had room to sit. When Buriev was seated, Reizin drove east along Emmons Avenue as Buriev and Krivoi followed. Krivoi and Reizin discussed

6

where they were headed on their mobile phones as they drove.

Roughly a mile east of the restaurant, they stopped in the public parking lot of a park. Reizin left his vehicle, instructed Buriev to get out of Krivoi's truck, and then placed Buriev in a "headlock." Gov't's App'x at 43. Krivoi stood closely behind Buriev as Reizin continued his grip. *See id*. (Buriev: "[Krivoi] was staying right behind me, literally like inches, millimeters. He was just walking, walking behind me like breathing like really heavily, like aggressively.").

According to Buriev, because there were people fishing at a nearby beach, Reizin walked Buriev to a more secluded location in the park that was surrounded by trees. Krivoi continued to follow closely behind. During the walk, Reizin accused Buriev of stealing from Reizin and Bratva by starting his competing power-washing business. Reizin also described Krivoi as a Bratva "soldier." Gov't's App'x at 45–46.

When the three men arrived at the secluded area, Reizin brandished a roughly 30-centimeter knife. Reizin said that Buriev owed Reizin and Bratva $10,000 and that Buriev had to pay up. Buriev said he simply did not have the money. Reizin obligingly reduced the demand to $5,000. Buriev replied that he could not pay that much either. Reizin told Krivoi "da-vai," which, Buriev

7

testified, is Russian for "[g]o" or "[d]o it." Gov't's App'x at 50. Krivoi then punched Buriev some seven or eight times and continued with the beating even after Reizin told him to stop.

When Krivoi eventually relented, Buriev agreed to Reizin's demand that he pay Reizin something. Reizin told Buriev that he would be expected to pay Reizin a small sum every month until Buriev's "debt" was paid. Krivoi proposed that they bury Buriev at the secluded location, but Reizin said that killing Buriev was not necessary since Buriev would keep quiet. Reizin also threatened to punish Buriev's family if Buriev went to the police.

The three men then walked back to the parking lot. Buriev asked to walk home but Reizin refused to let him do so. Gov't's App'x at 54 (Buriev: "I said, I really want to walk. Can I walk? [Reizin] said, No, you cannot. We'll drop you off where we picked you up."). Buriev got back into Krivoi's truck, and they followed Reizin back to Masal Cafe.

When they got there, Reizin again put Buriev in a headlock. Then, releasing Buriev, he told Buriev to keep walking without looking back. Krivoi and Reizin drove away soon afterwards. Cell-site information suggests that Krivoi, Reizin, and Buriev were together in their trip from the restaurant to the

park and back to the restaurant from about 8:00 PM to 8:29 PM on the day of the events in issue.

Buriev later consulted a lawyer who told him that going to the police would result in Reizin's arrest and temporary detention. But the lawyer also said that Reizin would be released within a day or two, which would pose an obvious danger to Buriev. Buriev sought help from the Federal Bureau of Investigation instead. An FBI agent told Buriev to pay Reizin as agreed while the FBI surveilled the transactions.

In later phone conversations, Reizin continued to threaten Buriev: "What, do you think that you are the only one who quit and started working on your own? Over my 15 years in this business, what do you think? Some were squashed with baseball bats, but some are still working . . . ." Gov't's App'x at 69.

Krivoi was not present when Buriev paid Reizin. There is also no evidence that Krivoi received any portion of any payment for himself. Even though Reizin had indeed once been a Bratva member, the FBI found no evidence, other than Reizin's statements to Buriev, that Krivoi had ever been a part of Bratva.

## II.    Procedural History

On November 29, 2017, the government issued a criminal complaint[6]

charging Krivoi and Reizin with extortion in violation of 18 U.S.C. § 1951.  On

February 26, 2018, a grand jury in the Eastern District of New York returned a

four-count indictment against Reizin and Krivoi, charging both with:

Kidnapping in violation of 18 U.S.C. § 1201(a)(1); kidnapping conspiracy in

violation of 18 U.S.C. § 1201(c); attempted extortion in violation of 18 U.S.C.

§ 1951(a); and extortion conspiracy in violation of 18 U.S.C. § 1951(a).  Reizin

pleaded guilty to all four counts before trial.  Krivoi pleaded not guilty to all four

counts.

In anticipation of Krivoi's trial, the government filed a motion in limine to

prohibit Krivoi's counsel from cross-examining Buriev about connections that

Buriev's family purportedly had with the FBI.  The district court granted the

government's motion on the ground that Krivoi did not offer a sufficient

evidentiary foundation to justify the questioning.  *See* Gov't's App'x at 373

("[Krivoi's arguments are] woefully insufficient to overcome the government's

---

[6] "The complaint is a written statement of the essential facts constituting the offense charged."
FED. R. CRIM. P. 3.

10

representation that there is no known relationship between [Buriev] and law enforcement, much less any member of law enforcement even remotely involved in the investigation or prosecution of this case."). In November 2018, a jury convicted Krivoi on all four counts of the indictment.

On May 26, 2021, the district court sentenced Krivoi principally to 84 months of imprisonment on counts one through four, each term to run concurrently, and two years of supervised release. On June 8, 2021, Krivoi filed a timely notice of appeal.

## DISCUSSION

Krivoi raises two issues on appeal. He argues first that the government failed to present sufficient evidence to sustain his kidnapping convictions.[7] Second, he contends that the district court violated his right to present a complete defense by preventing him from cross-examining Buriev about any connections his family may have to the FBI. We reject both claims.

### I. Krivoi's Substantive Challenges to His Kidnapping Convictions

Krivoi challenges his kidnapping convictions substantively in two ways: (A) Buriev's detention was too brief to constitute kidnapping under the relevant

---

[7] As noted above, Krivoi does not challenge his extortion convictions on appeal.

statute; and (B) even if Buriev was kidnapped, no reasonable jury could find that Krivoi either intended to aid and abet or conspired to commit that crime. Both challenges fail.

A.    Buriev Was Kidnapped

Krivoi was convicted of kidnapping and kidnapping conspiracy in violation of 18 U.S.C. § 1201(a)(1) and (c). With one exception not relevant here, section 1201(a)(1) applies to anyone who, using a facility of interstate commerce, "unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person." 18 U.S.C. § 1201(a). The statute contains three elements: (1) "the victim must be unlawfully taken, coerced, or deceived into accompanying the accused nonconsensually," *United States v. Corbett*, 750 F.3d 245, 250 (2d Cir. 2014) (citation omitted), (2) the victim "must be held by the accused for ransom, reward or otherwise," *id.* (citation omitted), and (3) there must be an interstate or foreign commerce nexus, *see* 18 U.S.C. § 1201(a)(1). Section 1201(c) prohibits conspiring to violate the federal kidnapping statute and committing an overt act in furtherance of the conspiracy. 18 U.S.C. § 1201(c).

Krivoi does not appear to contest that his and Reizin's conduct—including placing Buriev in a headlock and forcing him to a secluded location, and making telephone calls in furtherance of their criminal activity—satisfied the first and third of these elements, respectively. *Cf. United States v. Ramos*, 622 F. App'x 29, 30 (2d Cir. 2015) (summary order) ("We have held that even an intrastate telephone call constitutes the use of a facility of interstate commerce, in connection with the statute criminalizing murder-for-hire, which uses the same term as the kidnapping statute." (internal citation omitted)).

But Krivoi asserts that, as a matter of law, the detention of Buriev was too brief to satisfy the kidnapping statute's second element—that the victim was "*held by the accused* for ransom, reward or otherwise." *Corbett*, 750 F.3d at 250 (emphasis added) (citation omitted). This argument raises a question of law as to the interpretation of section 1201(a), which we address *de novo*. *See United States v. Mitchell*, 328 F.3d 77, 81 (2d Cir. 2003). (The requirement that the defendant hold the victim "for ransom or reward or otherwise," 18 U.S.C. § 1201(a); *accord Corbett*, 750 F.3d at 250, is not at issue in this appeal.[8])

---

[8] Krivoi does not dispute that his and Reizin's conduct, including detaining Buriev until he agreed to pay $5,000, satisfies this portion of section 1201(a)'s second element. *Cf. United States v. Cavallaro*, 553 F.2d 300, 304 (2d Cir. 1977) ("The word 'otherwise' was added to section 1201 in

Krivoi argues that not all detentions satisfy the kidnapping statute's second element and that, pursuant to our decision in *United States v. Rodriguez*, 587 F.3d 573 (2d Cir. 2009), Buriev's detention was not a kidnapping. In support, he urges adoption of the Third Circuit's test from *Government of the Virgin Islands v. Berry*, 604 F.2d 221 (3d Cir. 1979), which distinguishes detentions that constitute kidnapping from detentions that are merely incidental to a different crime.

We agree with Krivoi that not all detentions satisfy section 1201(a)'s second element. In *Chatwin v. United States*, 326 U.S. 455 (1946), the Supreme Court instructed that notwithstanding "the broad language of" the federal kidnapping statute,[9] courts must eschew "loose construction[s] of the statutory language [that] conceivably could lead to" absurd results and unfair punishments, *id.* at 464–65. The Supreme Court concluded that kidnapping "necessarily implies an unlawful physical or mental restraint *for an appreciable period* against the person's will and with a willful intent so to confine the victim."

---

1934 and means exactly what any person of ordinary intelligence would understand: that the statute extends to cases of persons kidnapped and held 'not only for reward, but for any other reason.'" (citations omitted)).

[9] *Chatwin* arose under a predecessor to the current kidnapping statute, 18 U.S.C. § 408a (1940).

14

*Id.* at 460 (emphasis added).[10]  Under *Chatwin*, then, unless the victim was

detained for an "appreciable" period, the victim was not kidnapped within the

meaning of the federal kidnapping statute.  *See Corbett*, 750 F.3d at 250 (citation

omitted); *accord* 18 U.S.C. § 1201(a); *United States v. Ferguson*, 65 F.4th 806, 811–12

(6th Cir. 2023); *United States v. Torres*, No. 20-cr-608 (DLC), 2021 WL 1947503, at

*9 (S.D.N.Y. May 13, 2021), *aff'd*, 2023 WL 378942 (2d Cir. Jan. 25, 2023) (summary

order).

In *Rodriguez*, we considered the "appreciable period" requirement in the

analogous context of the Hostage Act.[11]  587 F.3d at 580 (noting that the

requirement was derived from *Chatwin*).  In a taxi-fare scam, the defendants had

detained the victim for only about 15 minutes without any injury or threat of

injury to her, during most of which time all parties were awaiting the arrival of

the police, whom they knew had been called.  *Id.* at 581.  We held that the

victim's detention was not for an appreciable period and the defendants

therefore could not be convicted of hostage taking.  *Id.* at 581–82.

---

[10] We accept for present purposes the definition of "appreciable" contained in the eleventh edition of *Black's Law Dictionary*:  "Capable of being measured or perceived."  *Appreciable*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[11] Act for the Prevention and Punishment of the Crime of Hostage Taking, Pub. L. No. 98-473, Title II, ch. XX, pt. A, §§ 2001–2003, 98 Stat. 2186, 2186 (1984) (codified as amended at 18 U.S.C. § 1203).

Krivoi's assertions to the contrary notwithstanding, *Rodriguez* does not compel the conclusion that Buriev's detention was not a kidnapping. To be sure, like the 15-minute detention in *Rodriguez*, Buriev's detention was relatively brief. It is difficult to say exactly how long Reizin and Krivoi held Buriev against his will on May 22, but based on cell-site information suggesting that the three men were at Masal Cafe at approximately 8:00 PM and then again at approximately 8:29 PM, Buriev's detention was likely not much more than 30 minutes at most.[12]

But when determining whether a victim's detention is "appreciable," we consider not only the detention's length but also other aspects of the detention, such as the extent of the danger posed to the victim. *See, e.g., Rodriguez*, 587 F.3d at 581. Three key factors distinguish the conditions of Buriev's detention from those in *Rodriguez*. First, the detention in *Rodriguez* was not accompanied by "*any* injury or threat of injury," *id.* (emphasis added), whereas Buriev's detention involved multiple death threats and several acts of violence including a beating

---

[12] Krivoi claims that we should consider Buriev's detention to be even shorter because "the only inkling Krivoi had that Buriev was being restrained was when Buriev said he wanted to walk home but Reizin told him Krivoi would drop him off from where they picked him up." Reply Br. at 15. But since Buriev did not ask to walk home until after Reizin and Krivoi physically restrained Buriev, walked him to a secluded location, threatened him with a knife, beat him, and discussed killing him, a reasonable jury could find that Krivoi had an "inkling" that Buriev was being held against his will well before Buriev asked to walk home.

inflicted by Krivoi himself. Second, the perpetrators in *Rodriguez* knew the police had been called, and they were all awaiting the officers' arrival, *id.* at 577; Buriev was alone and was warned that his family would be harmed if he went to the police. Third, in *Rodriguez*, the victim was detained in a single location. *See id.* at 577, 581. Reizin and Krivoi forced Buriev to travel to several different locations while extorting him. While short, the detention was, at any rate, long enough to elicit a promise of specific payment. In light of these differences, we do not view *Rodriguez* as foreclosing the conclusion that Buriev was held for an appreciable period.

In arguing that Buriev was not in fact kidnapped, Krivoi urges us to adopt the Third Circuit's test for distinguishing detentions that are merely incidental to a separate crime such as extortion and therefore cannot sustain kidnapping convictions. In *Berry*, the court discussed "[t]he inequity inherent in permitting kidnapping prosecutions of those who in reality committed lesser or different offenses, of which temporary seizure or detention played an incidental part." 604 F.2d at 226; *see also id.* ("The principal danger of overzealous enforcement of kidnapping statutes is that persons who have committed such substantive crimes as robbery or assault which inherently involve the temporary detention or

17

seizure of the victim will suffer the far greater penalties prescribed by the kidnapping statutes.").  To avoid this injustice, the Third Circuit ruled that four factors determine whether a detention was sufficiently appreciable to constitute a kidnapping:

> (1) the duration of the detention or asportation; (2) whether the detention or asportation occurred during the commission of a separate offense; (3) whether the detention or asportation which occurred is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense.

*Id.* at 227.

Other circuits have adopted this test or commented on it favorably.  *E.g.*, *United States v. Jackson*, 24 F.4th 1308, 1314 (9th Cir. 2022) (adopting test); *United States v. Gabaldon*, 389 F.3d 1090, 1097 (10th Cir. 2004) (finding "much in the *Berry* test to commend its use"); *United States v. Howard*, 918 F.2d 1529, 1536 (11th Cir. 1990) (adopting test).  Our Circuit, however, has not yet considered the Third Circuit's approach.  *See United States v. Betancourt*, No. 3:16-cr-238 (SRU), 2019 WL 2720738, at *22 (D. Conn. June 28, 2019) (acknowledging *Berry* but commenting that "there is no guidance from the Second Circuit that holding incidental to another crime does not constitute holding for the purposes of proving kidnapping"), *aff'd*, 857 F. App'x 33, 34 (2d Cir. 2021) (summary order)

("For the reasons set forth in the district court's well-reasoned opinion, the evidence was sufficient for a reasonable jury to convict [the defendants of kidnapping and extortion offenses] . . . .").

The government argues that we should reject the *Berry* test because it conflicts with at least one prior decision of this Court, *United States v. DeLaMotte*, 434 F.2d 289 (2d Cir. 1970). There, we affirmed the kidnapping conviction of a defendant who participated in a truck hijacking. *Id.* at 291–93. The defendant had argued that "although the transportation of the truck driver [across state lines] literally f[ell] within the requirements of the kidnapping statute, it was really an integral part of another crime (i.e., the hijacking)," and that the kidnapping statute therefore should not apply to cases such as his. *Id.* at 292. We rejected the defendant's argument, *id.* at 292–93, acknowledging that although it was unlikely that Congress intended to treat as kidnappings the brief detentions that are integral to separate crimes such as robbery, "such a narrowing of the scope of the kidnapping statute is a legislative rather than a judicial function," *id.* at 292.

Despite that language, *DeLaMotte* does not preclude us from adopting the *Berry* test (or another test designed to address this issue) for at least two reasons.

19

First, *DeLaMotte*'s observations are non-binding dicta because the kidnapping in that case was not a "momentary detention in the course of a holdup" but rather "an extended, planned detention" that involved the transport of the victim across state lines.  434 F.2d at 291, 293.  Hence, as the Ninth Circuit has recognized, "*DeLaMotte* is neither precisely on point nor necessarily incompatible with *Berry*."  *Jackson*, 24 F.4th at 1314.

Second, when we decided *DeLaMotte* in 1970, the kidnapping statute was narrower in scope than it is now.  The statute then required that the defendant transport the victim across state lines, which meant that "the duration of the [victim's] seizure or asportation was rarely, if ever, an issue in kidnapping cases brought pursuant to federal law."  *Howard*, 918 F.2d at 1534.  Beginning with the amendment of the statute in 2006, however, a defendant could be prosecuted under the federal kidnapping statute if the defendant did no more than "travel[] in interstate or foreign commerce or use the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense."  Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 213, 120 Stat. 587, 616.  This requirement can be satisfied, as it is here, through an act as cursory as placing an intrastate phone

call.  *E.g.*, *Ramos*, 622 F. App'x at 30; *see also, e.g.*, *United States v. Perez*, 414 F.3d 302, 305 (2d Cir. 2005) (applying principle in murder-for-hire case under 18 U.S.C. § 1958, which uses language similar to the kidnapping statute).

Because our precedent neither compels nor precludes us from adopting the *Berry* test, we must decide whether to do so as a matter of first impression. When interpreting a statute, "our inquiry begins with the statutory text, and ends there as well if the text is unambiguous."  *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (plurality opinion).  Here, however, the plain meaning of the statutory text is not unambiguous.  The statute requires that a defendant "holds for ransom or reward or otherwise any person," 18 U.S.C. § 1201(a), without defining what it means to "hold[]" a person.  The verb "holds" is susceptible to a range of different meanings.  *See, e.g.*, *hold*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/hold (last visited Aug. 4, 2023) (including over a dozen definitions); *see also Student Loan Mktg. Ass'n v. Riley*, 104 F.3d 397, 407 (D.C. Cir. 1997), *on reh'g* (Mar. 11, 1997) (discussing varying interpretations of the term "hold" in another statutory context).

As the Supreme Court observed when interpreting the predecessor federal kidnapping statute in *Chatwin*, "the broadness of the statutory language does not

21

permit us to tear the words out of their context." 326 U.S. at 464; *see also Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019) (plurality opinion) (similar). "Particularly when interpreting a statute that features as elastic a word as 'use'"—or, in this case, "holds"—"we construe language in its context and in light of the terms surrounding it." *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004). Here, the surrounding statutory text—which requires the government to prove that a defendant "unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away" the person, 18 U.S.C. § 1201(a)—implies that the term "holds" refers to some form of compelled or physical restraint.[13] But even narrowing the term "holds" to coerced actions doesn't do much in the way of resolving ambiguities. Every handshake involves a physical holding of a sort, but surely that is not what Congress had in mind for this element of the federal kidnapping crime, and it is "well-established that a statute should be interpreted in a way that avoids absurd results." *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 705 (2d Cir. 2019) (internal quotation marks, citations, and alterations omitted).

---

[13] This compelled or physical restraint can be achieved, at least initially, through "physical or psychological force" in addition to "deceit" or "trickery." *Corbett*, 750 F.3d at 251. We take no position here on whether "§ 1201(a) may be satisfied when a victim is 'held' only by the victim's continuing belief in his kidnapper's dupe." *Id.*; *see also id.* (discussing the different approaches circuits have adopted for resolving cases where a defendant "*continues* to use trickery to 'hold' his victim captive, without resorting to physical or psychological coercion").

Furthermore, "[t]he rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality opinion). For these reasons, it would be improper to adopt the broadest possible interpretation of the term "holds."

Moreover, we think that the *Berry* court's concerns about the "overzealous enforcement" of the federal kidnapping statute, 604 F.2d at 226, are significant. "Courts must always be careful to avoid convicting a defendant for a crime which is in effect a necessary element of another crime for which the defendant has also been convicted." *United States v. Peden*, 961 F.2d 517, 522–23 (5th Cir. 1992). The current version of the federal kidnapping statute is broad enough to enable an overzealous prosecutor to apply its language to "unattractive or immoral situations lacking . . . the very essence of the crime of kidnapping." *Chatwin*, 326 U.S. at 464. Just as the Supreme Court recognized the need to adopt a narrow reading of the kidnapping statute at issue in *Chatwin*, we recognize the dangers of reading the current version of the federal kidnapping statute too broadly.

We therefore adopt a narrowing gloss on the current kidnapping statute that is similar in key respects to the *Berry* test, but somewhat simplified and

easier to apply. When a defendant is charged with both kidnapping and another offense, the defendant's conduct satisfies section 1201(a)'s second element—i.e., that the defendant "holds for ransom or reward or otherwise any person," 18 U.S.C. § 1201; *accord Corbett*, 750 F.3d at 250—only if the defendant held the victim for a period that was appreciably longer than the time required to commit the other offense.

This test contains two implicit requirements. First, as is the case in all federal kidnapping prosecutions, a defendant may be convicted of kidnapping and a separate offense only if the victim was held for an appreciable period. *See Chatwin*, 326 U.S. at 460; *Ferguson*, 65 F.4th at 811, 814–15. Second, that period must itself be appreciably longer than the time the defendant needed to commit only the other crime or crimes with which he or she has been charged. To be clear, this test should not be viewed as a simple comparison between the time needed to commit the kidnapping and the time needed to commit the separate offense. Instead, like the *Berry* test, our approach separates the kidnappings that defendants commit *in addition* to their other crimes from detentions that are merely necessary *components* of other crimes. Further, the conditions and peril of

24

the victim's confinement may bear upon whether the additional time of detention was "appreciable."

Applying this test, we conclude that the conduct of Reizin and Krivoi satisfied the federal kidnapping statute's second element. While Buriev's 30-minute detention may be characterized as relatively brief, it was nonetheless "appreciable." As noted, Krivoi and Reizin forced Buriev into Krivoi's vehicle under threat of violence, physically restrained Buriev before walking him to a more secluded location, threatened Buriev with a knife, beat Buriev repeatedly, and included Buriev's family in their threats. The perilous nature of these conditions weighs heavily in favor of concluding that Buriev's detention was appreciable. This conclusion is also supported by the fact that Krivoi and Reizin transported Buriev to several different locations. *Cf. Gov't of the V.I. v. Ventura*, 775 F.2d 92, 99 (3d Cir. 1985) ("By any interpretation of the words, no matter how narrow, appellant 'abducted' his victim: he seized her by the ear and pulled her to another place.").

Moreover, Krivoi and Reizin detained Buriev for a period appreciably longer than what they would have required if they had only extorted him. Extortion here could have been accomplished in the course of one or more phone

conversations with Buriev or while meeting with him at Masal Cafe. Instead, through violence and threats of violence, Krivoi and Reizin held Buriev under their control for roughly half an hour. Even after Buriev relented and agreed to pay the extortionate demand, he was not freed: Reizen refused to let Buriev walk home, and Krivoi knowingly transported Buriev against his will back to Masal Cafe, thereby prolonging and emphasizing their terrorizing control over him.

To be sure, Buriev's kidnapping was intimately related to his extortion; the facts suggest that Krivoi and Reizin kidnapped Buriev to scare him and thereby help persuade him to pay the sum that they were demanding. But kidnappings are typically designed to instill fear that will yield payment, so the fact that Buriev's kidnapping was connected to his extortion does not transform the kidnapping into an incidental part of the extortion scheme. The kidnapping was a separate and additional crime—overlapping but not coterminous—that independently subjected Krivoi to criminal liability. We therefore reject Krivoi's claim that Buriev's detention was too brief to constitute kidnapping under section 1201(a).

B.     A Reasonable Jury Could Find that Krivoi Intended to Aid and Abet and
       Conspired to Commit Buriev's Kidnapping

Krivoi's second substantive challenge to his convictions is that the

evidence at trial was not sufficient to support the jury's conclusion that he

possessed the level of intent required to sustain his kidnapping convictions.  We

disagree.

We review *de novo* a challenge to the sufficiency of the evidence supporting

a defendant's conviction.  *United States v. Harvey*, 746 F.3d 87, 89 (2d Cir. 2014)

(per curiam).  But a defendant "mounting such a challenge 'bears a heavy

burden,'" *id.* (citation omitted), because we must assess whether the evidence

was sufficient to sustain the defendant's conviction while viewing "the evidence

in the light most favorable to the government, drawing all inferences in the

government's favor and deferring to the jury's assessments of the witnesses'

credibility," *id.* (citation omitted).  We will sustain the defendant's conviction "if

'*any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt.'"  *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319

(1979)).

Krivoi was convicted of aiding and abetting Buriev's kidnapping.  Krivoi

claims that to obtain a conviction on that charge, the government was required to

prove that he "derived 'some benefit' from the alleged kidnapping," and that the government failed in that effort. Appellant's Br. at 33 (citation omitted). But, as the government points out, the law of this Circuit does not require proof that the defendant derived a benefit from the crime in order to prosecute on an aiding and abetting theory.[14] To the contrary, we have held that an aiding and abetting prosecution requires the government to prove only "that the underlying crime was committed by a person other than the defendant, that the defendant knew of the crime, and that the defendant acted with the intent to contribute to the success of the underlying crime." *United States v. Huezo*, 546 F.3d 174, 179 (2d Cir. 2008) (citation omitted).

Furthermore, although "criminal intent must exist in the minds of both the principal and the aider or abetter," *DeLaMotte*, 434 F.2d at 293, such intent is not required with respect to every step of the plan. "[I]n proscribing aiding and abetting, Congress used language that 'comprehends all assistance rendered by words, acts, encouragement, support, or *presence* . . .'—even if that aid relates to

---

[14] A defendant also does not need to benefit financially from their criminal act in order to be guilty of committing a kidnapping in violation of section 1201. *See Corbett*, 750 F.3d at 250 (listing section 1201(a)'s three elements, none of which require that the defendant derive a financial benefit); *see also Cavallaro*, 553 F.2d at 304 ("[T]he argument that section 1201 requires a motive of pecuniary profit has been rejected by the Supreme Court and more recently by this court." (internal citation omitted)).

only one (or some) of a crime's phases or elements." *United States v. Zayac*, 765

F.3d 112, 121 (2d Cir. 2014) (second alteration in original) (quoting *Rosemond v.*

*United States*, 572 U.S. 65, 73 (2014)). "So long as the defendant has 'assisted' in

any of these ways, he shares liability for any criminal conduct carried out by his

accomplice with or without his active participation." *Id.*

A reasonable jury could find that in Krivoi's case, the government met its

burden to prove the elements of kidnapping beyond a reasonable doubt. As

explained above, Buriev's detention constituted kidnapping under the federal

kidnapping statute. And a reasonable jury could easily find that Krivoi knew of

this kidnapping inasmuch as he directly participated in its commission.

Although proof of a defendant's "mere presence" at the scene of a crime or

"association" with an individual engaging in criminal activity is not sufficient to

support a conviction for aiding and abetting, *Huezo*, 546 F.3d at 181 (citation

omitted), Krivoi's actions went well beyond that threshold. Krivoi drove Buriev

to the extortion site; walked closely behind Buriev as Reizin dragged Buriev in a

headlock, thereby preventing escape; punched Buriev at Reizin's direction; and

drove Buriev against his will back to the rendezvous point. A reasonable jury

could, based on these facts, decide that Krivoi acted with the intent to assist

29

Reizin in his commission of the crimes at issue. We therefore affirm Krivoi's

aiding and abetting kidnapping conviction.

Krivoi was also convicted of conspiring to kidnap Buriev. To convict

Krivoi of this offense, the government was required to prove that Krivoi "agreed

with another to commit the offense; that he knowingly engaged in the conspiracy

with the specific intent to commit the offenses that were the objects of the

conspiracy; and that an overt act in furtherance of the conspiracy was

committed." *Huezo*, 546 F.3d at 180 (citation omitted). Krivoi asserts that the

government failed to satisfy these requirements because the government

presented no "direct evidence of a meeting of the minds between Krivoi and

Reizin." Appellant's Br. at 32. Krivoi also asserts that the fact that he had to

move papers from the front seat of his truck before Buriev could sit down there

proves that Krivoi did not know that he would be driving Buriev to a more

secluded location and shows that Krivoi intended that Buriev be extorted at

Masal Cafe.

Krivoi's argument fails. A defendant's participation in a criminal

conspiracy "with the requisite knowledge and criminal intent may be established

through circumstantial evidence." *Huezo*, 546 F.3d at 180 (citation omitted). The

government is not required to show that the defendant "knew all of the details of the conspiracy, so long as he knew its general nature and extent." *United States v. Rosa*, 17 F.3d 1531, 1543 (2d Cir. 1994). Circumstantial evidence indicates that Krivoi was aware of Reizin's general plan to kidnap Buriev. Cell-site location information showed that Krivoi and Reizin were together before and during the kidnapping. Krivoi concedes that Reizin called him for help with confronting Buriev and explains the request by noting that they had trained in martial arts together. Buriev's testimony describing the abduction and assault, which Krivoi does not materially dispute, also suggests that Krivoi was well aware of Reizin's plan in advance. Krivoi knew to follow Reizin's vehicle as the two men drove to and from Masal Cafe, he knew to hold Buriev as Reizin threatened him with a knife, and he knew to begin punching Buriev on Reizin's cue to "[g]o" or "[d]o it." Gov't's App'x at 50–51. This circumstantial evidence showing that Krivoi knew of the violence planned also allows for the inference that Krivoi knew they would be transporting Buriev: If Krivoi anticipated that the confrontation would involve violent threats, he could not reasonably have expected it to happen in public inside the café where the rendezvous with Buriev was planned. Viewing this evidence in the light most favorable to the government, we conclude that a

reasonable jury could find that Krivoi knew Reizin's plan, at least in broad terms, and knowingly engaged in that plan with the specific intent to bring about its success.

In sum, because the evidence was sufficient to find both that Buriev was kidnapped and that Krivoi possessed the requisite level of intent required to convict him of aiding and abetting and of conspiring to commit that kidnapping, we reject Krivoi's substantive challenges to his kidnapping convictions.

## II.    Krivoi's Evidentiary Challenge

Krivoi's final argument is that the district court violated his right to present a complete defense by preventing him from cross-examining Buriev about any connections that his family may have had to the FBI.  We conclude that this argument, too, is meritless.

A district court may limit cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).  We review a district court's decision to restrict cross-examination for abuse of discretion.  *United States v. Figueroa*, 548 F.3d 222, 226 (2d Cir. 2008).  And even when a district court abuses its discretion

by limiting a defendant's right to cross-examine a witness, we will not vacate the defendant's conviction if we determine, beyond a reasonable doubt, that the district court's abuse of discretion was harmless. *See Van Arsdall*, 475 U.S. at 681; *Figueroa*, 548 F.3d at 231.

In this case, Krivoi sought to cross-examine Buriev about FBI connections, purportedly to show that the FBI pursued Buriev's allegations because of personal bias in Buriev's favor and that the FBI conducted its investigation in a haphazard way that prejudiced Krivoi. The district court ruled that Krivoi could cross-examine specific FBI agents about their potential bias but that Krivoi did not establish an appropriate evidentiary foundation to question Buriev about his family's connections to the FBI generally.[15]

The district court's ruling was not an abuse of discretion. To support his accusation of bias, Krivoi claimed that Buriev told Reizin that Buriev's mother had friends in the FBI, and Krivoi speculated that Buriev's mother may have been able to immigrate to the United States because of those connections. But

---

[15] Krivoi chose not to cross-examine the lead FBI agent who investigated this case. Krivoi's counsel claimed at oral argument before us that he did not understand the district court's order to allow for the possibility of such questioning. But even if Krivoi's misunderstanding of the district court's order were reasonable, we would not vacate Krivoi's convictions for the reasons set forth herein.

even if it were true that Buriev's mother had undefined connections with some unnamed individuals in the FBI, Krivoi did not present any evidence that the officers who investigated this case were specifically connected to Buriev. The district court therefore acted well within its discretion in concluding that this evidence was insufficient to permit questioning Buriev about his family ties. *See United States v. Concepcion*, 983 F.2d 369, 391 (2d Cir. 1992) ("The trial court may, in its discretion, preclude questions for which the questioner cannot show a good faith basis.").[16]

In any event, even if the trial court did abuse its discretion, any such abuse would have been harmless. Krivoi does not deny that he helped Reizin extort Buriev on May 22 or otherwise meaningfully dispute Buriev's recollection of that day's events. In light of these facts and the other evidence presented at trial, we have no reasonable doubt that the jury would still have convicted Krivoi of kidnapping and kidnapping conspiracy even if the district court had permitted Krivoi to ask Buriev about his family's connections to the FBI.

---

[16] Krivoi also contends on appeal that it was discovered during the course of trial that Buriev had previously owned a company that had the same name as a company that was indicted for stock fraud in the U.S. District Court for the Southern District of New York. Krivoi does not adequately explain how this fact, even if true, is relevant to his desire to question Buriev about his family's connections to the FBI.

**CONCLUSION**

We have considered Krivoi's remaining arguments on appeal and conclude that they are without merit.  For the reasons set forth above, we AFFIRM the judgment of the district court.