*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## No. 17-CF-0774

SERGIO VELASQUEZ CARDOZO, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2016-CF1-015152)

(Hon. Lynn Leibovitz, Trial Judge)

(Argued En Banc March 24, 2023                    Decided May 23, 2024 )

*Matthew B. Kaplan* for appellant.

*Nicholas P. Coleman*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, and *Chrisellen R. Kolb*, *Peter V. Taylor*, and *Kristina L. Ament*, Assistant United States Attorneys, were on the brief, for appellee.

*Stefanie Schneider*, with whom *Samia Fam* and *Mikel-Meredith Weidman*, Public Defender Service, were on the brief, for amicus curiae on behalf of appellant.

Before BLACKBURNE-RIGSBY, *Chief Judge*, BECKWITH, EASTERLY, MCLEESE, DEAHL, HOWARD, and SHANKER, *Associate Judges*, and STEADMAN, *Senior Judge*.

Opinion for the unanimous court by *Associate Judge* DEAHL.

Concurring opinion by *Associate Judge* EASTERLY at page 45.

DEAHL, *Associate Judge*: We reheard this case en banc to reexamine what it means to kidnap somebody under D.C. Code § 22-2001. The critical element of a kidnapping under that criminal statute is that a person must "hold[] or detain[]" another, or commit one of nine predicate acts with an intent to hold or detain them. Previous decisions of this court have ruled that momentary seizures satisfy that statutory element and thereby constitute kidnappings, reasoning that "there is no requirement that the victim be . . . held for any particular length of time." *Richardson v. United States*, 116 A.3d 434, 439 (D.C. 2015) (quoting *West v. United States*, 599 A.2d 788, 793 n.9 (D.C. 1991)).

Enter Sergio Velasquez Cardozo, the appellant in this case. He approached a woman from behind on a public sidewalk and groped her breasts and buttocks over her clothing, interrupting her walk for "a split second," before she shrugged him off and nearby police officers intervened. There is no doubt that was a sexual assault, for which Velasquez was convicted and sentenced. The question now is whether it was also a kidnapping. A jury concluded that it was, but only after repeated instructions that kidnappings do not require the victim be held for "any particular length of time," as our prior precedents instruct. A division of this court then affirmed the kidnapping conviction, concluding that binding authority required that result.

We now reverse Velasquez's kidnapping conviction and, in the process, we overrule our precedents holding that any momentary seizure against another's will is a kidnapping. To hold or detain somebody in the context of the District's kidnapping statute, we now conclude, means to detain them for a substantial period of time, so that the perpetrator could fairly be described as holding another captive like a hostage or a prisoner. Because Velasquez was convicted of kidnapping based on what could only be described as a momentary seizure, and not a substantial detention amounting to holding somebody captive like a hostage or a prisoner (and there was no evidence that he intended such a substantial detention), we reverse Velasquez's kidnapping conviction.

## I. The Underlying Facts

At around 1 a.m. one night, E.R. was walking home when Velasquez approached her from behind and grabbed her. He groped E.R.'s clothed breasts and buttocks and said something to the effect of, "do you want this?" After about a "split second," E.R. stumbled and shrugged him off, at which point Velasquez turned around and walked away. Two police officers patrolling the area observed the entire encounter. One of the officers rolled down his window and shouted to E.R., "hey, do you know him?" E.R. said she did not. The officers then caught up to Velasquez

and asked him why he grabbed her, which he denied doing. The officers noticed that Velasquez's pants zipper was down.

Velasquez was charged with one count of kidnapping, two counts of third-degree sexual abuse (one for grabbing E.R.'s breasts, and another for grabbing her buttocks), and one count of fourth-degree sexual abuse (on the theory that E.R. was incapable of appraising the nature of Velasquez's conduct because he snuck up on her). The case went to trial. The government's theory was that Velasquez's brief grab of E.R. constituted a kidnapping, but it offered no evidence or argument suggesting that Velasquez's intent was to detain her for a considerably longer period of time; for instance, there was no evidence or argument that Velasquez planned to drag E.R. into a nearby vehicle and spirit her away. The judge instructed the jury on the elements of the kidnapping charge in accordance with the model jury instructions, as follows:

> The elements of the offense of kidnapping, each of which the government must prove beyond a reasonable doubt, are, [1] that the defendant seized, confined, abducted, or carried away [E.R.] against her will; [2] that the defendant did so voluntarily and on purpose and not by mistake or accident; and [3] that the defendant held or detained [E.R.] for the purpose of assaulting her.

The judge, echoing this court's precedents, added: "There is no requirement that the complainant have been moved any particular distance or have been held for any particular length of time for a kidnapping to have taken place."

The jury registered some confusion on that last point. During deliberations, it sent a note asking: "Is there a definition of 'seizure' or 'seized' . . . relative to 'held' (in regard to amount of time) or do they mean the same thing?" Over defense counsel's objection, the judge responded that a "[s]eizure is defined as a forceful action in which an object or person is suddenly taken over, grabbed, removed, or overwhelmed," and that "to hold or detain requires that there be some period of time in which the complainant was held or detained, though there is no particular length of time that must be proved."

After two full days of deliberations, the jury found Velasquez guilty of kidnapping, one count of third-degree sexual abuse, one count of fourth-degree sexual abuse, and one count of misdemeanor sexual abuse (a lesser-included offense of the other charged third-degree sexual abuse). He was sentenced to five years' imprisonment for the kidnapping charge, while receiving lesser sentences for the sexual abuse charges. Two years into his sentence, Velasquez filed a motion to reduce his sentence to time served, which the government agreed was warranted "[i]n light of the technical nature of the kidnapping here." The trial court granted the motion.

A unanimous division of this court (1) affirmed Velasquez's kidnapping and third-degree sexual assault convictions, (2) held that the misdemeanor sexual assault

conviction merged with the third-degree sexual assault conviction (as the government conceded), and (3) reversed his conviction for fourth-degree sexual abuse on the ground that the evidence was insufficient to show that E.R. was "incapable of appraising the nature" of Velasquez's conduct as required by D.C. Code § 22-3005. *Cardozo v. United States*, 255 A.3d 979, 987 (D.C. 2021). The full court then granted en banc review and vacated the portion of the division's opinion affirming the kidnapping conviction, leaving the rest of the opinion in force. *Cardozo v. United States*, 268 A.3d 862 (D.C. 2022) (order granting en banc review).

## II. What It Means to Hold or Detain Another

The critical element of our kidnapping statute is that it proscribes "holding or detaining" another or taking some action to gain control over them "with the intent to hold or detain" them. D.C. Code § 22-2001. It is a fairly opaque statute passed by Congress nearly a century ago, in 1933. Its plain terms treat even a consented to holding or detention as a kidnapping. But the Supreme Court long ago soundly reasoned that "[t]he absurdity of such a result" was "sufficient by itself to foreclose that construction," so it added the extra-textual gloss that the detention had to be "against the will" of the victim. *Chatwin v. United States*, 326 U.S. 455, 460, 464-65 (1946) (interpreting federal kidnapping statute); *see also Beck v. United States*, 402

A.2d 418, 423 (D.C. 1979) (same as to District's statute). That gloss does not offer any insight into what it means to hold or detain another, though.

The parties now offer two competing theories about that, each of which has had some purchase in our caselaw at varying times over the years. The government, defending our most recent precedents, advances what it aptly describes as a "literal interpretation" of the statute. Because one can hold or detain something or somebody for a mere instant, it reasons that the words contain no durational requirement and a momentary unconsented to grasp of another (like Velasquez's of E.R.) is a kidnapping. *See Richardson*, 116 A.3d at 439 ("[T]here is no requirement that the victim be . . . held for any particular length of time." (quoting *West*, 599 A.2d at 793 n.9)). Velasquez, supported by amicus the Public Defender Service, counters that to interpret the statute so broadly is absurd and contrary to Congress's clear intent when passing this felony offense, currently punishable by up to thirty years' imprisonment. They argue—harkening back to some of our since-overruled precedents grounded in a now outdated approach to the merger doctrine—that to hold or detain another in the context of the kidnapping statute means to confine them for an extended period of time. *See Robinson v. United States*, 388 A.2d 1210, 1211 (D.C. 1978) (kidnapping requires "confinement and restraint . . . significant enough of themselves to warrant an independent prosecution"), *abrogated by Byrd v. United States*, 598 A.2d 386, 390 (D.C. 1991) (en banc), and *Parker v. United States*, 692

A.2d 913, 916 (D.C. 1997) (recognizing the fact-based merger approach to kidnapping as superseded). We now consider those competing theories.

**A. Mere Momentary Seizures Are Not Holdings or Detentions**

We conclude that Velasquez has the better of the core argument. When our kidnapping statute proscribes holding or detaining another, it means a substantial detention, akin to holding someone captive as a hostage or a prisoner. This conclusion is informed by (1) the statute's text and context, (2) the statute's legislative history and the harsh penalties it authorizes, (3) our obligation to avoid absurd statutory interpretations, and (4) the vast weight of authority interpreting the materially similar federal statute. We walk through each of those four points below.

*1. The Text and Context of the Statute*

When interpreting a statute, we first examine the language "by itself to see if [it] is plain and admits of no more than one meaning." *Eaglin v. District of Columbia*, 123 A.3d 953, 955 (D.C. 2015) (quoting *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc)). "[I]f the plain meaning of statutory language is clear and unambiguous and will not produce an absurd result, we will look no further." *Id.* at 956 (quoting *Smith v. United States*, 68 A.3d 729, 735 (D.C. 2013)).

The District's kidnapping statute, broken down into its three elements, prohibits: "[1] seizing, confining, inveigling, enticing, decoying, kidnapping, abducting, concealing, or carrying away any individual by any means whatsoever, and [2] holding or detaining, or with the intent to hold or detain, such individual [3] for ransom or reward or otherwise." D.C. Code § 22-2001. The first element, which we sometimes refer to as the predicate act, covers all means by which one may gain physical control over another person. And the third element, or purpose element, does little work because its "or otherwise" language is so broad that it seemingly reduces to nothing. *See United States v. Healy*, 376 U.S. 75, 81-82 (1964) ("The wording certainly suggests no distinction based on the ultimate purpose of a kidnaping."); *Gooch v. United States*, 297 U.S. 124, 128 (1936) (purpose element requires only that the kidnapping be "done with the expectation of benefit to the transgressor").

The real action thus lies in the statute's second element, proscribing "holding or detaining" another against their will, or acting with an intent to do so. The government argues that those terms should be given their literal meaning, and when read literally, momentarily grasping somebody "holds" or "detains" them, however briefly. That is certainly one possible literal interpretation of those words, but it is not the only one.

Some perfectly literal definitions of the words hold and detain evoke far lengthier deprivations, and are inconsistent with momentary seizures. For instance, the definitions of detain include "[t]o hold or keep as in custody," Webster's Collegiate Dictionary 274 (1941 ed.), "to keep prisoner" and "to keep in confinement," 3 Oxford English Dictionary 264 (1933 ed.).[1] Similarly, definitions of hold include "[t]o detain in custody" and to "keep under arrest." 5 Oxford English Dictionary 330-31 (1933 ed.); Oxford English Dictionary 468 (Supp. 1933) ("To detain in custody, keep under arrest."); *Hold*, Black's Law Dictionary 896 (3d ed. 1933) ("[T]o keep in custody.").[2] These definitions seem incompatible with fleeting grasps.

---

[1] We look to dictionaries that are roughly contemporaneous with the kidnapping statute's 1933 enactment, *see Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566, 569 (2012) (noting that the "relevant dictionaries" are the ones "in use when Congress enacted the" statute), though these particular words' meanings do not seem to have materially changed in the ninety-plus years since then.

[2] While the dictionaries often define hold and detain in terms of holding somebody "in custody," we instead use the term captive in the test we pronounce today to avoid any implication that the custody must be state sanctioned. Our test adds the word hostage to prisoner for the same reason: Prisoner could likewise be understood to connote state sanctioned detention, while the word hostage strips out that implication. We do not mean the words hostage and prisoner to convey distinct concepts—just as we do not understand the statutory terms holding and detaining to convey distinct concepts, *see infra* notes 5-6 and accompanying text (discussing synonymia)—but instead as synonyms that amplify one another's meaning.

To illustrate the point, consider two different usages of the word detain: (1) a chatty colleague detained me at work, and (2) the United States should not detain children at the Mexican border. The first usage is compatible with the fleeting notion of detention that the government advances, but not the second. A reasonable person would not understand the first statement as an assertion that the chatty colleague held me in captivity, but instead that they merely delayed my departure. Conversely, a reasonable person would not speak or understand the second statement as an assertion that children should not be stopped or delayed at the border, even for a passport or security check. When we talk about detention in the second sense—like when we talk about "enemy combatants . . . detained" in Guantanamo Bay, *Boumediene v. Bush*, 553 U.S. 723, 732 (2008), or the "detention of those of Japanese ancestry" during World War II, *Korematsu v. United States*, 323 U.S. 214, 221 (1944)—we do not mean momentary obstructions to free movement. If your friend told you that their grandfather was detained in a Japanese internment camp during World War II, and you later came to learn that their grandfather worked as a camp guard and was once forced to work beyond his scheduled shift, you would think your friend was either a liar or obtuse.

The same goes for the word hold. Consider a school that has a detention policy instructing that teachers may "hold a student after class" only for a limited set of disciplinary infractions. If a teacher merely delayed a student's departure to hand

back an assignment or to briefly discuss some concern, only a pedant would contend that the detention policy had been violated in the absence of some attendant disciplinary infraction. And they would have a losing argument, because we are talking about a detention policy here, and that context indicates that only protracted holdings are covered by the policy. Or consider one statement in two different contexts: "The teacher held on to the ball." If that were said in the context of a baseball game with students, it would fairly describe holding on to the ball just long enough to record an out before tossing it back to the pitcher. *See* Major League Baseball, *Official Rules of Baseball* at 147 (2023 ed.) ("In establishing the validity of the catch, the fielder shall hold the ball long enough to prove that he has complete control of the ball and that his release of the ball is voluntary and intentional."). But if it were said in the context of the teacher holding a ball because a student was disruptively playing with it during class, one would not conceive of the teacher momentarily grasping the ball and then handing it back. In that context, it would clearly mean that the teacher held on to the ball for a lengthy period of time, possibly until the end of class or overnight.

So context is critical when interpreting what the statute means by "holding or detaining," because "words . . . can work differently depending on context." *Pulsifer v. United States*, 144 S. Ct. 718, 736 (2024); *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("The meaning . . . of certain

words or phrases may only become evident when placed in context."). It is particularly necessary to bear "context" in mind "when interpreting a statute that features as elastic a word as . . . 'holds.'" *United States v. Krivoi*, 80 F.4th 142, 153 (2d Cir. 2023) (quoting *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004)). Sometimes context dictates that fish are not tangible objects, *see Yates v. United States*, 574 U.S. 528, 532 (2015) (interpreting 18 U.S.C. § 1519), or that "and" means "or," *Pulsifer*, 144 S. Ct. at 723 (reading "and" in the disjunctive). We entertain no similar stretch of the statutory text as those examples; as illustrated above, in certain contexts the very words hold or detain sometimes can only refer to protracted detentions.

The Supreme Court has emphasized the point in this very context. When interpreting the federal kidnapping statute, it stressed that there was no "indication that Congress desired or contemplated that the punishment of death or long imprisonment, as authorized by the [federal] Act, might be applied to those guilty of immoralities lacking the characteristics of true kidnapings."[3] *Chatwin*, 326 U.S. at

---

[3] As discussed further below in Part II.A.2, the District's kidnapping statute was modeled after the federal statute and was initially passed as a lifetime offense, Pub. L. 72-362, 47 Stat. 858 (1933), though at the time Congress debated making it punishable by death as the federal statute once authorized. *See generally United States v. Jackson*, 390 U.S. 570, 591 (1968) ("holding the death penalty clause of the Federal Kidnaping Act unenforceable"). The District's statute was amended in 2000 to lower the maximum sentence to thirty years. *See* Sentencing Reform Amendment Act of 2000, D.C. Act 13-406 § 4(g), 47 D.C. Reg. 7249 (Aug. 2, 2000).

464. *Chatwin* expressly warned against "tear[ing] the [statute's] words out of their context," because "to disregard the background and setting of" the kidnapping statute would lead to "a careless concept of the crime of kidnaping" in which "the boundaries of potential liability would be lost in infinity." *Id.* at 464. With those admonitions, it emphasized that a kidnapping "necessarily implies" a detention "*for an appreciable period.*" *Id.* at 460 (emphasis added).

Consistent with the Supreme Court's guidance, we agree that this context makes clear that the kidnapping statute proscribes only detentions of substantial duration, and that Congress did not mean "holding or detaining" in their broadest senses as capturing any momentary grasps. The government offers two retorts.

First, it argues that *Chatwin*'s cautions are non-binding dicta. It is right about that, but even dicta of the Supreme Court has persuasive force, *Gabbs Expl. Co. v. Udall*, 315 F.2d 37, 39 (D.C. Cir. 1963), and here we think it is not only persuasive but borders on the self-evident. Put directly: *Of course* Congress did not mean to proscribe fleeting seizures when passing this felony offense originally punishable by a lifetime in prison, and we need not close our eyes to that where the text is perfectly susceptible to a more sensible interpretation.

Second, the government argues that *Chatwin*'s use of "the word 'appreciable' does not imply 'substantial,'" and that it instead meant something like "perceptible."

We disagree. It is evident that the Supreme Court meant "appreciable" in the sense of "considerable," "substantial," or "significant." *See Appreciable*, Oxford English Dictionary Online, www.oed.com/view/Entry/9784; https://perma.cc/4PZL-A4R8 (last visited April 15, 2024) ("of a significant extent or degree"); Random House College Dictionary 66 (1966 ed.) ("considerable"); *Noland v. Wootan*, 427 P.2d 143, 145 (Ariz. 1967) ("appreciable" sometimes means "capable of being perceived" and other times is "used as meaning considerable" (citing Random House Dictionary)). It would not make any sense to warn against extending a kidnapping statute to cover imperceptible seizures, should such a thing even exist, because imperceptible seizures would stand no risk of being prosecuted in the first place. They are, by definition, undetectable. Contrary to the government's view, one court has cogently held that a fifteen minute detention does not clear *Chatwin*'s bar for an "appreciable period" of detention, while opining that a three-hour detention would clear it. *See United States v. Rodriguez*, 587 F.3d 573, 580-81 (2d Cir. 2009) (reversing conviction under 18 U.S.C. § 1203(a) after applying *Chatwin*'s "appreciable period" test to Hostage Taking Act's detention element); *see also United States v. Carrion-Caliz*, 944 F.2d 220, 224 (5th Cir. 1991) (adopting *Chatwin*'s "appreciable period" test in Hostage Taking Act context "[i]n light of the persistent similarities between the kidnapping statute and [that] Act").

Perhaps the government's argument is really that we should ignore context and give the words holding and detaining their broadest possible meanings, which indeed would capture Velasquez's conduct here. But that is simply not a defensible approach to statutory interpretation, particularly as to a criminal statute. *Williams v. United States*, 458 U.S. 279, 290 (1982) ("[A] narrow interpretation . . . would be consistent with our usual approach to the construction of criminal statutes."). Statutory language should not be interpreted in either its narrowest or its broadest sense, but instead in its fairest sense. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 356 (2012) ("Strict constructionism, as opposed to fair-reading textualism, is not a doctrine to be taken seriously" and "is an irretrievably pejorative term."); *Utah Junk Co. v. Porter*, 328 U.S. 39, 44 (1946) ("[L]iteralness may strangle meaning."); *New York Tr. Co. v. Comm'r*, 68 F.2d 19, 20 (2d Cir. 1933) (Hand, J.) ("[A] sterile literalism . . . loses sight of the forest for the trees."). Or maybe the government's view is that the words should be given their *most* "ordinary meaning," but even granting that the word holding most typically encompasses fleeting grasps—which does not seem to be true of detaining—this too is not a defensible approach to statutory interpretation where context points toward a different (even if somewhat less commonplace) meaning. "When words have several plausible definitions," as here, "context differentiates among them." *United States v. Hansen*, 599 U.S. 762, 775 (2023).

Finally, we comment on the statute's structure. Velasquez argues that it compels a conclusion that holding or detaining another must mean something more than the predicate acts of "seizing," "confining," "carrying away," and the like. That is because if a person is seized, confined, or carried away—the statute's predicate acts—they have perforce also been held or detained, rendering that second and separate element of the offense superfluous in the mine run of cases. So, the argument goes, the statute's structure suggests that holding or detaining involves some escalation of the predicate list of verbs, i.e., that one can commit the predicate acts without holding or detaining another.

That might be right, but we ultimately do not assign any importance to this consideration for a few reasons. First, Velasquez's argument is true only of some of the predicate acts, but others one could engage in without necessarily holding or detaining another.[4] Second, the interpretive canon counseling against statutory

---

[4] Three of the nine predicate verbs—"inveigling, enticing, [and] decoying"— do not necessarily involve a holding or detaining even under the government's broad reading of those words. Still, we agree with Velasquez that all seizures (the typical predicate act in a kidnapping prosecution) would involve a holding or detaining under the government's reading of the statute. The government disputes the point, countering that even under its view there is no redundancy between seizure, on the one hand, and holding and detaining, on the other. Its argument goes that a "seizure" in the Fourth Amendment context "does not always result in actual physical control," *see Torres v. Madrid*, 592 U.S. 306, 312 (2021), so that a seizure need not involve an actual holding or detention. But that does not actually resolve the redundancy. Even if we interpreted the word "seizure" in the kidnapping statute as synonymous

redundancies is undercut by the fact that there are unquestionably redundancies in the kidnapping statute under any reading of it. For instance, the predicate acts are often redundant of one another—query how one might confine or carry away somebody without seizing them. *See Moskal v. United States*, 498 U.S. 103, 120 (1990) (Scalia, J., dissenting) (rule against surplusage should not "be applied to the obvious instances of iteration to which lawyers, alas, are particularly addicted"); Brett M. Kavanaugh, *The Courts and the Administrative State*, 64 Case W. Rsrv. L. Rev. 711, 718 (2014) (noting that "members of Congress often want to be redundant" because they want "to make doubly sure about things"). We similarly do not understand "hold or detain" to convey two distinct concepts, but a unitary one, with the redundancy serving to amplify and clarify the two words' intended meanings.[5] Bryan A. Garner, A Dictionary of Modern Legal Usage 292 (1995) ("Amplification by synonym," known as "*synonymia*," "has long been a part of the

---

with its modern Fourth Amendment meaning—and we are not sure why we would load it up with all of that baggage—the redundancy would persist because one need only intend to hold or detain another to satisfy the statute's second element. And under the Fourth Amendment, the application of physical force is only a seizure if accompanied by an "*intent* to restrain." *Id.* at 309 (emphasis added). So in order to have seized somebody in a Fourth Amendment sense, one must either actually hold them, or have acted with the intent to hold them, thereby satisfying the statute's second element. Any seizure is thus a kidnapping under the government's approach.

[5] No party before us suggests that the two words have different meanings, and we are not familiar with any case that has treated the words as having distinct connotations.

English language, and especially a part of the language of the law.").[6] And even under our preferred interpretation, holding and detaining seem redundant of the predicate acts of "kidnapping" and "abducting," which similarly suggest lengthy detentions so that some surplusage across the first two elements seems inevitable. That is not to say that this structural point is entirely without force, but there are enough reasons to doubt its application—and it does not carry any dispositive weight in any event—that we remain agnostic about it.

## 2. Legislative History and Penalties

The history of the kidnapping statute provides further reason to understand it as covering only lengthy detentions, not momentary grasps. At common law, the term "kidnapping" described "forcible abduction or stealing away of a man, woman, or child, from their own country, and sending them into another." 4 William Blackstone, Commentaries on the Laws of England *218-19 (1769); *see* John L. Diamond, *Kidnapping: A Modern Definition*, 13 Am. J. Crim. L. 1, 2-3 (1985) ("['Kidnapping'] was used to describe the forced recruitment of labor for the American colonies."). Early American statutes retained kidnapping's carrying away

---

[6] *Cf.* Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 688 (2016) (exploring similar rhetorical device of hendiadys in the Constitution, where "two terms separated by a conjunction work together as a single complex expression").

element, sometimes referred to as asportation, but watered it down so that crossing state lines rather than international boundaries was sufficient. *See id.* at 3; Model Penal Code § 212.1 cmt. 1. Early in the District's history, it was a crime (known as abduction) to "kidnap, seize, or take any free person" with "the intent unlawfully to carry or convey such person out of the [] District." D.C. Crim. L. § 26 (1816 ed.); *see also* D.C. Code § 812 (1901 ed.) (abduction applies to anyone who "unlawfully and forcibly or fraudulently carries off or decoys out of the District any person, or arrests or imprisons any person with the intention of having such person carried out of the District").

In the 1920s and 30s, though, a wave of high-profile abductions thrust the crime of kidnapping into the public consciousness. *See* Hugh A. Fisher & Matthew F. McGuire, *Kidnapping and the So-Called Lindbergh Law*, 12 N.Y.U. L.Q. Rev. 646, 651-52 (1935); Note, *A Rationale of the Law of Kidnapping*, 53 Colum. L. Rev. 540, 540 (1953). Headlining that wave was the kidnapping and murder of twenty-month-old Charles Augustus Lindbergh, Jr.—the eldest son of famed aviator and Time Magazine's Man of the Year in 1928, Charles Augustus Lindbergh—bringing an already simmering public outrage over high profile kidnappings to a boiling point. Fisher & McGuire, *supra*, 12 N.Y.U. L.Q. Rev. at 653. More than a month of repeated ransom demands, and ultimately a hefty ransom payment, followed; the Lindbergh baby was later found dead more than two months after he was taken. *See*

FBI, *Famous Cases: Lindbergh Kidnapping*, https://www.fbi.gov/history/famous-cases/lindbergh-kidnapping; https://perma.cc/9EH8-L7RR (last visited April 21, 2024).

Congress reacted quickly to the hysteria, passing a federal kidnapping statute that same year and the District's kidnapping statute the following year. 75 Cong. Rec. 13,325 (1932) (statement of Rep. Thatcher) ("[T]he horrible crimes involved in the kidnaping of the Lindbergh baby focused the attention of the Congress on the subject of enacting legislation which would strengthen existing law."). As the Supreme Court said in *Chatwin*, the federal kidnapping statute was designed to "stamp[] out th[e] growing and sinister menace of kidnaping" wealthy individuals by "[r]uthless criminal bands." 326 U.S. at 462-63. The legislative debates in the District reflect that understanding. As one House member put it when discussing the proposed statute: "No crime is more monstrous than is this one" and "no penalty is too severe for those who perpetrate these unspeakable offenses against society and the home." 75 Cong. Rec. 13,325 (1932) (statement of Rep. Thatcher). In short, our kidnapping statute was passed in response to kidnappings where people were abducted and held for days, weeks, or months, typically in pursuit of hefty ransoms.

That is no doubt why it would take about forty years after our kidnapping statute's enactment for a mere minutes-long kidnapping to be prosecuted under it, at

least so far as any reported case reveals. *See United States v. Wolford*, 444 F.2d 876, 878 (D.C. Cir. 1971) (victims released "about forty-five minutes or an hour from the time they were abducted").[7] And it would be still another fifty years before we reached our present nadir—a kidnapping of a few seconds or less. If the government's reading of the statute were as natural as it asserts, surely it would not have taken nearly a century for the countless robberies and assaults where a person is momentarily detained to be prosecuted as kidnappings. Yet even the most zealous and creative prosecutors were generally not charging them as such, at least not until after we decided *Richardson* in the past decade.

The government counters that in passing the District's kidnapping statute, Congress "meant to *expand* liability well beyond traditional, common-law notions of kidnapping." There is no doubt about that, but it begs the question of just how

---

[7] Perhaps the statute's original purpose requirement—that the detention be "for ransom or reward"—kept it from being applied to most assaults, at least until the "or otherwise" language was added in 1965, effectively eliminating any purpose requirement. But that does not explain why robberies were not routinely prosecuted as kidnappings in the prior decades if the government's reading were a natural one, given that the spoils of every robbery would seem to fit neatly within the word "reward," and robberies almost always involve some brief seizure of the victim. Also, the Supreme Court made it fairly clear in 1936 that the "or otherwise" language—which had been added to the federal statute in 1934—was a "clarify[ing]" amendment, suggesting it entailed no substantive change to the statute at all because "reward" already included non-pecuniary benefits. *Gooch*, 297 U.S. at 126, 128 ("[R]eward implies something given in return for good or evil done or received.").

far it meant to expand that criminal liability.  Under any reading of the District's kidnapping statute, it expanded the crime of kidnapping well beyond its interpretation at common law: There is no requirement that the victim be transported out of the country or even across any state lines.  But the fact that Congress intended to expand the definition of kidnapping does not mean it intended to expand it into infinity.

The severe penalties attached to the District's kidnapping law provide another contextual clue that the legislature did not intend it to apply to momentary seizures, but only to lengthy detentions.  Kidnapping is one of the most serious offenses in the District's criminal code.  It is currently punishable "by imprisonment for not more than 30 years," § 22-2001, though up until fairly recently, it was punishable by a lifetime in prison.  *See* Sentencing Reform Amendment Act of 2000, D.C. Act 13-406 § 4(g), 47 D.C. Reg. 7249 (Aug. 2, 2000).  Kidnapping is a "Class A felony," the most serious category of offense in the District, D.C. Code § 22-2001, and it is one of the few enumerated offenses that a felony murder conviction can be predicated upon, D.C. Code § 22-2101.  If every momentary seizure were a kidnapping, that would transform virtually every battery, robbery, and groping into a thirty-year offense, despite legislative determinations that those offenses do not merit that degree of punishment.

Consider simple assault, an offense punishable by no more than 180 days in jail. D.C. Code § 22-404. While there are varieties of assault that need not involve a touching, the typical assault is a battery, i.e., an intentional "harmful or offensive" "touching or use of force upon the physical person of another." *Holder v. District of Columbia*, 700 A.2d 738, 743 n.6 (D.C. 1997); *see also Perez Hernandez v. United States*, 286 A.3d 990, 999 (D.C. 2022) (en banc) ("Battery is an assault."). To intentionally apply force to another almost inevitably involves obstructing their movement to some degree, so that any battery could fairly be described as holding and detaining another in the broadest sense of those words that the government prefers. Even acknowledging that an application of force need not necessarily do so—saving any discussion of Newtonian physics for another day—we doubt the legislature meant to increase the punishment for battery offenses sixty-fold whenever the assailed is halted by the application of force. In fact, unlike assault, kidnapping does not require that the touching be harmful or offensive, only that it be unconsented to. *See* D.C. Code § 22-404. So even inoffensive grasps of another, like grabbing somebody's shoulder to congratulate them on a job well done, which fall short of a misdemeanor assault, would still be felony kidnappings punishable by thirty years' imprisonment.

The crime of "jostling," punishable by no more than ninety days in jail, is another example. D.C. Code § 22-1321(g). It involves "a rough physical touching

of one individual by another," which would invariably seem to involve obstructing their movement in a manner that the government would say is a kidnapping. *In re A.B.*, 395 A.2d 59, 62 (D.C. 1978). As the government argued before the division, "the District's kidnapping provision captures all conduct obstructing or forcing the movement of another without their consent," which would seem to cover all jostlings. The government now walks its thinking back a bit, and argues that mere jostling is not a kidnapping unless the person is "not simply impeded but actively prevented from leaving," but it is tough to see the difference between those two things. When a person is impeded, they would seem to be actively prevented from going about their way, even if only momentarily. And even assuming there is some non-illusory distinction between impeding somebody and actively preventing their movement, as the government posits, it is not conceivable that the legislature intended a 120-fold increase in the potential punishment—from a ninety day jostling to a thirty-year kidnapping—to turn on something so inconsequential.

Through our more recent construction of the kidnapping statute, we have ushered countless lesser offenses under the kidnapping umbrella and replaced their legislatively authorized sentences with a thirty-year cap. Courts have routinely recognized this as the very mistake the Supreme Court warned against in *Chatwin*. *See Virgin Islands v. Berry*, 604 F.2d 221, 226 (3d Cir. 1979) ("The principal danger of overzealous enforcement of kidnapping statutes is that persons who have

committed such substantive crimes as robbery or assault which inherently involve the temporary detention or seizure of the victim will suffer the far greater penalties prescribed by the kidnapping statutes."); *People v. Levy*, 204 N.E.2d 842, 844 (N.Y. 1965) (a broad definition of kidnapping "could literally overrun several other crimes, notably robbery and rape, and in some circumstances assault, since detention and sometimes confinement, against the will of the victim, frequently accompany these crimes"); *United States v. Corralez*, 61 M.J. 737, 748 (A.F. Ct. Crim. App. 2005) ("Turning these simple assaults, each punishable by a maximum of six months of confinement, into far more serious offenses . . . reflects precisely the 'careless concept of the crime' of kidnapping that has long been condemned as a misuse of the offense and sought to be avoided." (quoting *Chatwin*, 326 U.S. at 464)); *see also* Model Penal Code § 212.1, cmts. at 13-15 (Am. Law Inst. 1960) ("the worst" abuses in prosecuting kidnappings target "behavior that amounts in substance to robbery or rape"); *United States v. Etsitty*, 130 F.3d 420, 428 (9th Cir. 1997) (Kleinfeld, J., concurring) (kidnapping "is not committed whenever someone is held against their will," otherwise "Congress would have empowered prosecutors at their unfettered discretion to charge the same conduct . . . as a mere misdemeanor or a life imprisonment felony").

The government counters that the kidnapping statute contains no mandatory minimum, so while a thirty year sentence is authorized, nothing prevents judges from

sentencing offenders in a way that is more commensurate with the particular offense at hand. That is true enough, but there can be no doubt that the maximum authorized penalty is a strong indication of how serious the legislature thinks the baseline offense is, even without any mandatory minimum. So we cannot ignore the maximum penalty that Congress authorized when passing the District's kidnapping statute simply because the offense has no mandatory minimum.

This very case demonstrates the reality that the maximum authorized penalty clearly (and quite reasonably) informs sentencing judges' views about the severity of the offense. If you asked E.R. what was the more serious violation, as between her split-second detention and the sexual assaults that accompanied it, surely she would say the sexual assaults were the far greater affront than being momentarily stopped; she would have preferred having her stride broken sans the sexual assaults to being sexually assaulted without her stride being broken. And independent of his kidnapping conviction, Velasquez has been convicted of third-degree sexual abuse—a conviction upheld by the division in this case—a serious felony punishable by up to ten years' imprisonment. Yet Velasquez's most severe punishment in this case was for the kidnapping offense, listed as the "[m]ost serious offense of conviction" in his judgment and commitment order with an attendant sentence that was considerably longer than the sentence attendant to any of his sexual abuse

convictions. That is a consequence of the government's view, which is not a tenable ranking of offenses to ascribe to the legislature.

### 3. Absurdity

We are bound to avoid absurd statutory interpretations. When one possible interpretation "would lead to absurd consequences which the legislature could not have intended," we reject it. *James Parreco & Son v. D.C. Rental Hous. Comm'n*, 567 A.2d 43, 46 (D.C. 1989); *accord Holt v. United States*, 565 A.2d 970, 972 (D.C. 1989) (en banc). We shun "interpretations that lead to unreasonable results," *Grayson v. AT&T Corp.*, 15 A.3d 219, 238 (D.C. 2011) (en banc) (quoting *In re C.L.M.*, 766 A.2d 992, 996 (D.C. 2001)), and "avoid interpretations of statutes which lead to implausible results," *Wade v. United States*, 173 A.3d 87, 95 (D.C. 2017) (quoting *Eaglin*, 123 A.3d at 957). That is true even when abiding by this principle deviates from the most natural reading of a statute. *Moten v. United States*, 81 A.3d 1274, 1277 (D.C. 2013) ("[I]f a 'literal interpretation of the statute would lead to an absurd result, the court will follow the legislative intent despite literal wording.'" (quoting *Haney v. United States*, 473 A.2d 393, 394 (D.C. 1984))); *James Parreco & Son*, 567 A.2d at 46 (when confronted with absurdity we "do not wallow in literalism").

The kidnapping statute is patently absurd if applied to momentary seizures. Unconsented to holdings and detentions, if those terms are given their broadest meanings as the government prefers, are so commonplace that it would defy reason to say they are all felony kidnappings subject to thirty years' imprisonment. Holding somebody back from a fight, grasping another to alert them to a dropped wallet, surprising an old friend with an unexpected hug, tugging a spouse's arm to rouse them from sleep, or grabbing somebody in order to congratulate them—these are all kidnappings under the government's view. The government resists these logical extensions of its view, but not persuasively.

The government does not dispute that holding somebody back from a fight or grasping somebody to alert them to a dropped wallet meets "the literal elements" of a kidnapping under its reading, but counters that the would-be kidnapper in those scenarios "likely would be excused under the doctrine of necessity." That is a stretch. The necessity defense, which we have rarely found viable over the decades, does not apply unless "the harm that would have resulted from compliance with the law would have significantly exceeded the harm actually resulting from the defendants' breach of the law." *Griffin v. United States*, 447 A.2d 776, 777 (D.C.

1982).[8]  And it is hard to see how the harm of a lost wallet or of a fight breaking out would significantly exceed the harm of a kidnapping—if indeed the above are kidnappings, as the government maintains—given that the legislature has adjudged kidnapping to be a far more serious offense than the simple assault of a person or theft of a wallet, both generally misdemeanor offenses.[9]  "Under any conception of legal necessity, one principle is clear: The defense cannot succeed when the legislature itself has made a 'determination of values.'"  *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 491 (2001) (quoting 1 W. LaFave & A. Scott, Substantive Criminal Law § 5.4., at 629 (1986)).  Kidnapping is simply the greater evil, not the significantly lesser one, so that the necessity defense would not apply to skirt these absurdities in the government's interpretation.

---

[8] The government does not actually spell out what it thinks the requirements of a necessity defense are, and the defense is so rarely invoked that we do not attempt here to definitively articulate its contours.  Whatever the state of our law is on the topic, we leave it undisturbed.  Our precedents have said, in addition to the above, the necessity defense is unavailable when: "(1) there is a legal alternative available to the defendants that does not involve violation of the law; (2) the harm to be prevented is neither imminent, nor would be directly affected by the defendants' actions; and (3) the defendants' actions were not reasonably designed to actually prevent the threatened greater harm."  *Griffin*, 447 A.3d at 778 (citations omitted).

[9] Like simple assault, second-degree theft is punishable by a maximum 180 days' incarceration.  D.C. Code § 3212(b).  It becomes a felony offense, punishable by a maximum of ten years, if the value of property stolen is $1,000 or more, a threshold that wallets tend not to clear.  *Id.* § 3212(a).

As for the unforeseen hug of a friend, rousing a spouse awake, and congratulatory grab, the government asserts that at least the first two acts "would be presumed consensual." But that just dodges the absurdity by presuming it away, so let us instead presume that they are not consensual contacts because the friend does not like hugs (or the friendship is unrequited), and the spouse would genuinely prefer to continue sleeping and objects to being tugged at. Then, in the government's view, these are no mere social faux pas, impolitic acts, or even minor criminal offenses—they are felony kidnappings. And government counsel has repeatedly acknowledged that under the government's view it would be a kidnapping if his opposing counsel were to grab him by the shoulder on the way out of the courtroom in order to say "good job." All of the above are untenable applications of the kidnapping statute that fit squarely within the government's interpretation of it.

Because the absurdities in its interpretation so abound, the government appeals to prosecutorial discretion, assuring us that it will simply not prosecute the everyday variety of innocuous kidnappings. That is all well and good, but the very fact that the government's reading of the statute encompasses innocuous kidnappings that prosecutors would tend to overlook only underscores why it is absurd. The government's assurance that it will not prosecute more run-of-the-mill kidnappings does not obviate the absurdity, but magnifies it.

There is no other offense approaching the seriousness of a kidnapping that one might describe in any of its forms as innocuous and undeserving of prosecution. There are no casual murders too inconsequential to care about; no first-degree sexual assaults that the victim might shrug off; no light treasons that should go unprosecuted; no assaults with intent to kill that are too garden-variety to be noticed; and no category of armed carjackings that prosecutors would stand up in court and promise not to charge, despite having an ironclad case. There cannot possibly be unobjectionable thirty-year felony offenses that we all routinely commit and fall victim to. To endorse the government's definition of kidnapping would trivialize the severity of the offense beyond the point of absurdity.

### 4. *Other Jurisdictions Reject the Notion of Momentary Kidnappings*

Our conclusion is bolstered by the fact that other jurisdictions have generally rejected the view that momentary seizures are felony kidnappings. We have previously acknowledged "a trend away from the District's current conception" of kidnapping, *Spencer v. United States*, 132 A.3d 1163, 1172 (D.C. 2016), but we think that understates the point. We have found no other jurisdiction that has ever upheld a split-second kidnapping, and the government has pointed to none. The government counters that most states have simply adopted statutes that more particularly circumscribe the contours of a kidnapping, either by (1) specifying a

minimum length of detention, *see, e.g.*, N.Y. Penal Law § 135.25(2) ("more than twelve hours" for first-degree kidnapping); (2) requiring that a kidnapping be for a limited category of unlawful purposes, *see, e.g.*, N.C. Gen. Stat. § 14-39; (3) requiring that the detention be "substantial" or the like, *see, e.g.*, Or. Stat. § 163.225 (requiring "intent to interfere substantially with another's personal liberty"); or by taking some combination of those three steps. It is a fair point that state statutes vary so widely that they do not shed much light on how best to interpret our own kidnapping statute. Still, there are a number of federal court decisions that have scrutinized what it means to hold or detain another under statutes quite similar to our own, so we turn to those.

The federal circuit courts that have confronted the issue have uniformly rejected the view that momentary seizures are kidnappings.[10] The most influential

---

[10] There are admittedly not all that many on-point cases because most federal kidnappings fall under 18 U.S.C. § 1201(a)(1), where the federal hook is that the person was transported across state or international boundaries. Those cases rarely raise any questions about brief seizures because such interstate asportations tend to be quite protracted. *See United States v. Gabaldon*, 389 F.3d 1090, 1097 (10th Cir. 2004) (making the same point). But the federal kidnapping prohibition also applies where the holding or detention is "within the special maritime and territorial jurisdiction of the United States," *id.* § 1201(a)(2), and it is in that subset of federal kidnapping prosecutions—most typically on tribal lands—where courts have most frequently confronted whether momentary seizures are kidnappings. *Gabaldon*, 389 F.3d at 1097 (this issue typically arises "[w]here, as here, the statute requires only that a seizure or restraint take place within the special territorial jurisdiction of the United States").

case on this topic is *Virgin Islands v. Berry,* where the Third Circuit interpreted a Virgin Islands statute quite similar to our own. 604 F.2d at 227 (interpreting V.I. Code Ann. Tit. 14, § 1052 (1978)). *Berry* concerned two defendants seeking to recoup a debt from their victim. They told him that they were driving him to visit a friend, but instead drove him to a beach where they directed him to strip down and then robbed him of his clothes, wallet, and money. *Id.* at 223. In analyzing whether that was a kidnapping, the court held that "temporary seizure[s] or detention[s] . . . incidental" to other crimes were not covered by the kidnapping statute, *id.* at 226, a view that had once prevailed in this court, *see Robinson*, 388 A.2d at 1212 (kidnapping requires detention that is not "merely incidental to" another crime). The court adopted a four-factor test, sometimes called the "*Berry* test" (discussed further below), which emphasizes the detention's duration and the extent to which it was incidental to another offense as critical to whether a kidnapping occurred. Ultimately, the court in *Berry* held that the defendants did not commit a kidnapping, but merely a robbery. 604 F.2d at 229.

The other circuit courts examining what it means to hold someone under 18 U.S.C. § 1201 have followed the Third Circuit's lead and ruled that brief detentions

incidental to other crimes are not kidnappings.[11] *See, e.g.*, *United States v. Jackson*, 24 F.4th 1308, 1314 (9th Cir. 2022) (adopting *Berry* test); *United States v. Howard*, 918 F.2d 1529, 1536 (11th Cir. 1990) (same); *Krivoi*, 80 F.4th at 153 (adopting test "similar in key respects" to *Berry* but "somewhat simplified"); *United States v. Murphy*, 2024 WL 2003307, at *10 (10th Cir. May 7, 2024) (kidnapping "require[s] an appreciable temporal period of detention (i.e., holding) beyond that inherent in the commission of another offense," while expressing "no need or inclination to rely on the *Berry* test" in full).

The government seems to acknowledge that the federal circuits are aligned against its view that transitory seizures are kidnappings, so it takes direct aim at those cases. It asserts that each stems from the "central flaw of disregarding the statutory text in favor of an allegedly more reasonable version of kidnapping." But there is

---

[11] The federal statute applies to "[w]hoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away *and holds* for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof," 18 U.S.C. § 1201(a) (emphasis added), provided one of the five jurisdictional hooks is satisfied, *id.* § 1201(a)(1)-(5). Notice four seemingly inconsequential differences between the federal and the District's statute: (1) the federal statute does not mention detaining, as only "hold[ing]" satisfies the second element; (2) unlike the District's statute, a mere intent to hold another will not satisfy the federal statute's second element, though the statute covers attempts to kidnap elsewhere, *id.* § 1201(d); (3) the federal statute lists just seven predicate acts—the same predicate acts in our statute, minus enticing and concealing; and (4) it requires that one of those predicate acts be committed "unlawfully," a seemingly circular addition.

no such flaw in any of these cases. In each case the courts grappled with the text of the kidnapping statute before it, and rather than stripping the word holding out of its context and giving it the broadest possible meaning, they instead read it rather sensibly in light of the surrounding context. For all of the reasons articulated above, today we do likewise and reject the notion that any momentary seizure is a kidnapping under our statute.

## B. "Holding or Detaining" Another Means to Detain Them for a Substantial Period of Time, Akin to Holding Them Captive as a Hostage or a Prisoner

That still leaves the task of fleshing out what it means to hold or detain another, having concluded that a momentary seizure does not suffice. Consistent with *Chatwin*'s warnings, dictionary definitions, and the bulk of authority on the topic, we conclude that to hold or detain somebody in the context of the kidnapping statute means to detain them against their will for a substantial period of time, so that the perpetrator could fairly be described as holding another captive like a hostage or a prisoner. The perpetrator need not succeed in detaining another for such a period, of course, because under our statute the government may alternatively prove that they had an "intent to [so] hold or detain" the person, D.C. Code § 22-2001, to account for escapes and thwarted kidnappings. We do not adopt any bright-line number of minutes or hours where a transitory seizure crosses the threshold into a kidnapping, but think that the commonsense concepts above provide jurors and

defendants alike with sufficient guidance. We add more meat to those bones below, but we first pause to explain why we focus on the duration of the detention, while (unlike the federal circuits) paying no mind to whether it was incidental to another offense.

As explained above, the federal circuits have generally adopted some variation of the four-factor *Berry* test, and both Velasquez and his amicus urge us to do likewise. While the first factor of that test focuses on the duration of a detention, the other three factors all concern whether the detention was incidental to some other offense. More specifically, *Berry*'s four factors are:

> (1) the duration of the detention or asportation;
> (2) whether the detention or asportation occurred during the commission of a separate offense; (3) whether the detention or asportation which occurred is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense.

*Berry*, 604 F.2d at 227. We decline to put stock in the second through fourth factors, which the Second Circuit has fairly synthesized into a single factor: whether "the defendant held the victim for a period that was appreciably longer than the time

required to commit the other offense." *Krivoi*, 80 F.4th at 153. We instead focus on the duration of the detention itself, for a few reasons.

First, we do not think it makes any sense that an extended detention would be a kidnapping if done just for the sake of it, but not a kidnapping if done to accomplish some attendant offense. Put simply, an hours-long detention is no less a kidnapping by virtue of it being accompanied by a protracted rape or some extended torture; if anything those attendant offenses make it more obviously a kidnapping. Consider literary and cinematic character Jame Gumb, a.k.a. Buffalo Bill, who detained his victims in a manner that was merely incidental to his ultimate plan of desecrating their corpses, a criminal offense in the states where Gumb operated. *See* The Silence of the Lambs (St. Martin's Press 1988; Orion Pictures 1991); Ohio Rev. Code § 2927.01 ("abuse of a corpse"); Tenn. Code Ann. § 39-17-312 ("Corpses; abuse"). Gumb kept his victims alive and detained them in a pit for days in order to starve them, thereby loosening their skin, while having them apply lotion periodically, thereby softening it. That their detentions were merely incidental to his ultimate goal of making a suit from their flesh hardly seems like a point that counts against Gumb being a kidnapper. To be sure, there will be a strong correlation between the duration of a detention and whether it was "appreciably longer than the time required to commit" any attendant offenses, *Krivoi*, 80 F.4th at 153, which is likely why so many federal courts have gravitated toward this "incidental to another offense"

factor. But the fact that it is a pretty good proxy for a detention's duration is no reason to give it any independent force. It is far better to narrow the focus onto duration of the detention, without the distractions of its rough correlates.

Second, the Model Penal Code treats this consideration as cutting in the opposite direction. Under the Model Penal Code, two of the limited proscribed purposes that elevate a detention "for a substantial period" into a kidnapping are if the detention facilitates the commission of a felony or the infliction of bodily injury.[12] *Id.* § 212.1(b), (c). That strikes us as the slightly more sensible view, though we ultimately attach no independent significance to whether a detention is incidental to another crime.

Third, it is the duration of the detention that tends to be the dispositive factor in cases that purport to scrutinize whether the detention was incidental to another offense. The cases can be roughly sorted by that factor alone. Courts tend to treat detentions of less than thirty minutes as short of a kidnapping and incidental to other offenses. *See Jackson*, 24 F.4th at 1310, 1314 ("six or seven minutes" insufficient

---

[12] Like many state statutes, the Model Penal Code takes a graduated approach to unlawful detentions, with a misdemeanor "false imprisonment," § 212.3, an aggravated "felonious restraint," § 212.2, and "kidnapping" as the most aggravated variety of the offense, § 212.1. It is doubtful that Velasquez's conduct could be considered even the misdemeanor offense of false imprisonment under the Model Penal Code's approach, as it requires that one "interfere substantially with [the] liberty" of another. § 212.3.

under *Berry*); *Levy*, 204 N.E.2d at 843-44 ("20 minutes" insufficient where "incident[al] to other crimes"); *Corralez*, 61 M.J. at 748-49 ("five or ten minutes" insufficient under six-part *Berry*-like test); *see also Rodriguez*, 587 F.3d at 580-81 ("fifteen minute[]" detention "incident[al] to a taxi fare dispute" not an "appreciable period" under Hostage Taking Act). On the other hand, they generally treat detentions of more than an hour as sufficient to constitute kidnappings and non-incidental to other offenses.[13] *Commonwealth v. Rushing*, 99 A.3d 416, 426-27, 422 (Pa. 2014) (detention for "at least two hours" was not "incidental to the other crimes" though the victims "were confined with the intention of committing the other crimes"); *State v. Strong*, 999 A.2d 765, 768, 772 (Conn. App. Ct. 2010) (victim's detention "for more than one hour" "could not be considered merely incidental" to other offenses). In between those benchmarks, detentions between thirty minutes and an hour may be sufficient to constitute kidnappings when they bear some other

---

[13] There are cases that break this mold at both ends of the spectrum, but they are the outliers. *Compare People v. Rico*, 2014 WL 4978645, at *10 (Ill. App. Oct. 6, 2014) (unpublished) (concluding that three hour confinement was "incidental to defendant's residential burglary and home invasion" and reversing kidnapping conviction), and *People v. Jackson*, 406 N.Y.S.2d 345, 346 (N.Y. App. Div. 1978) (evidence of kidnapping insufficient where "[t]he entire incident lasted more than one hour" because it "was incidental to the commission of the uncharged crime of rape"), *with West*, 599 A.2d at 793 (kidnapping conviction upheld where detention for "over a period of a quarter of an hour" and was not "incidental" to rape and robbery offenses), and *People v. Ware*, 751 N.E.2d 81, 88, 90 (Ill. App. 2001) ("kidnapping was not merely incidental to the sexual assault" despite detention lasting "only a few minutes").

hallmarks of a kidnapping, such as moving the victim a considerable distance or eliciting a ransom. *See Krivoi*, 80 F.4th at 150, 150-51, 154 (stressing that victim was driven to "several different locations while extorting him" during a period of "not much more than 30 minutes"); *Wolford*, 444 F.2d at 878 (victims were held "about forty-five minutes or an hour" and driven "3.8 miles" as the crow flies).

Without endorsing those specific results, or adopting any particular bright line, we view the above outcomes as generally sensible and consistent with what it means to detain somebody under our statute, that is, in captivity for a substantial period of time like a hostage or a prisoner. We doubt detentions of less than thirty minutes should be sustained as kidnappings under our statute—unless there were some evidence that a lengthier detention was intended—either by this court or by trial courts ruling on motions for judgments of acquittal. *See* D.C. Sup. Ct. Crim. R. 29 (motions for judgment of acquittal); *see also Jackson*, 24 F.4th at 1314 (*Berry* inquiry should be "taken up during a Rule 29 motion").[14] We likewise doubt that a

---

[14] We reserve comment on whether or when defendants might successfully move to dismiss a kidnapping indictment for failure to charge a detention of sufficient duration. *See generally* D.C. Sup. Ct. Crim. R. 12(b)(3)(B)(v) (motions to dismiss an indictment for "failure to state an offense"); *cf. United States v. Brewbaker*, 87 F.4th 563, 572 (4th Cir. 2023) ("A criminal indictment—like a civil complaint—should be dismissed [when it] fail[s] 'to state an offense,'" and trial "courts have as much of a responsibility to police criminal indictments as they do civil complaints." (quoting Fed. R. Crim. P. 12(b)(3)(B)(v) (citing James M. Burnham, *Why Don't Courts Dismiss Indictments?*, 18 Green Bag 2d 347 (2015)))).

kidnapping conviction for a detention of more than an hour should ever be disturbed for insufficiency of the evidence as to the holding or detaining element.

While there will no doubt be close cases in between those benchmarks, courts may look to (or advise jurors that they may consider) whether other hallmarks of kidnappings are present in those cases, such as whether the victim was bound or moved a significant distance, or whether a particular ransom was sought, as we think each of those factors could inform whether someone could be fairly described as a hostage or a prisoner. *See* Model Penal Code § 212.1 (giving weight to whether the victim was moved "a substantial distance" and whether a ransom was sought). We stress that a jury can and should consider the entire factual context of the situation when determining if somebody has been held for such a time and in such a manner that they could fairly be described as being held captive as a hostage or a prisoner. But a sufficiently long detention need not bear any particular hallmarks to constitute a kidnapping. It is the involuntary detention itself that "is the very essence of the crime of kidnaping." *Chatwin*, 326 U.S. at 464.

Because Velasquez's amicus specifically asks that we layer an "isolating the victim from aid" element onto the kidnapping statute, we pause to explain why we do not do so. Namely, it is not clear what that requirement even means. It would make little sense if it meant the victim had to be held in some out-of-the-way place

entirely isolated from others. Consider the 1977 Hanafi Siege, a prototypical example of a kidnapping in the District's history, where more than 100 hostages were held captive for about thirty-nine hours at the headquarters of B'nai B'rith in downtown Washington, D.C. (dozens more were taken hostage in two nearby buildings, two were killed, and then-councilman and future mayor Marion Barry was shot). *See generally Khaalis v. United States*, 408 A.2d 313, 319-25 (D.C. 1979). The hostages were not isolated from aid in the sense that (1) there were more than 100 of them together in the B'nai B'rith headquarters, (2) law enforcement knew exactly where they were and (3) officers were working actively to free them as the hours ticked on. The hostages were still unquestionably kidnapped. *Id.* at 362 (upholding kidnapping convictions, stressing that "secrecy [i]s not an element of kidnapping . . . under our statute"). We presume amicus would say that those hostages were in fact isolated from aid because aid could not effectively reach them, in which case this proposed requirement seems to add nothing to the requirement that the person be held against their will. If a person is held against their will for a substantial period of time and aid does not in fact reach them, we fail to see the import of them being in a position so that aid might have reached them sooner had they only been more fortunate.

Amicus also asks that we craft a jury instruction, which this court has proactively done at times. *See, e.g.*, *Fleming v. United States*, 224 A.3d 213, 228-29

(D.C. 2020) (en banc). We decline the invitation, because we think it suffices to say (for now, at least) that jurors should be instructed that to hold or detain somebody means to detain them for a substantial period of time, so that the defendant could fairly be described as holding another captive like a hostage or a prisoner. That surely would have been clear enough for the jury in this case to acquit Velasquez of kidnapping, given the jury's seeming (and sensible) reticence to accept the court's repeated instructions that a kidnapping does not require a holding or detention for any "particular length of time." Without placing constraints on what more trial courts might wish to say consistent with our analysis above, we save for another day any model instruction beyond that.

### III. Conclusion

No reasonable juror could have concluded that Velasquez detained E.R. for a substantial period of time, akin to holding her captive as a hostage or a prisoner. There was likewise no evidence, and the government made no argument before the jury, that Velasquez intended to detain E.R. for such a substantial period; the evidence was pretty clearly to the contrary where E.R. shrugged Velasquez off and he then walked away. We thus conclude that there was insufficient evidence to sustain Velasquez's kidnapping conviction and we reverse that conviction. The division's decree otherwise remains in force and controls the proceedings on

remand. *Cardozo*, 255 A.3d at 988 (affirming third-degree sexual abuse conviction, reversing fourth-degree sexual abuse conviction, and remanding for resentencing and reissuance of the judgment).

*So ordered.*

EASTERLY, *Associate Judge*, concurring:  Yet again, this court is called upon to interpret an antiquated statute—this one enacted in 1933—that does not clearly describe the conduct to be punished.  Unlike the majority of states around the country, the District has never modernized its criminal code.  Recognizing that our old code needed to be overhauled, the Council of the District of Columbia created the Criminal Code Reform Commission in 2016 to rewrite many of our criminal laws.  The Council directed the Commission, *inter alia*, to "[u]se clear and plain language," "[a]pply consistent, clearly articulated definitions," "[d]escribe all elements, including mental states, that must be proven," "[r]educe unnecessary overlap and gaps between criminal offenses," and "[i]dentify any crimes defined in common law that should be codified, and propose recommended language for codification, as appropriate."  D.C. Code § 3-152(a).  After five years of work and with the unanimous support of an advisory group composed of the U.S. Attorneys' Office, the Office of the Attorney General, the Public Defender Service, and a group

of law professors, the Commission delivered to the Council draft legislation and an accompanying report explaining how and why the recommendations would change existing law. *D.C. Criminal Code Reform Commission (CCRC) Recommendations for the Council and Mayor* (2021), https://ccrc.dc.gov/sites/default/files/dc/sites/ ccrc/publication/attachments/Revised-Criminal-Code-RCC-Compilation.pdf; https://perma.cc/9X5B-A4PL. Although the Council unanimously approved the Revised Criminal Code Act of 2022, which adopted the Commission's recommendations nearly in their entirety, *B24-0416 – Revised Criminal Code Act of 2021*, Council of the District of Columbia, https://lims.dccouncil.gov/ Legislation/B24-0416; https://perma.cc/EF3L-CRDN (click "View Voting Details" for entry dated November 15, 2022), that legislation did not become law.

This case demonstrates that the District still needs a new criminal code. Until one is enacted, judges will fill the breach, to the extent we are able. *See Perez Hernandez v. United States*, 286 A.3d 990, 1008 (D.C. 2022) (en banc) (Easterly, J., concurring) (explaining that "there is a difference in my view between interpreting the common law with a purpose to ensure due process and double jeopardy guarantees are realized and announcing new grounds for criminal conviction" (footnote omitted)). But in a representative democracy, fundamental and elemental questions about the boundaries of criminal law and the appropriate punishment for its violation are best addressed, in the first instance, by the Council as the District's

legislative body. *See Bond v. United States*, 572 U.S. 844, 867 (2014) (Scalia, J., concurring) ("It is the responsibility of the legislature, not the Court, . . . to define a crime, and ordain its punishment." (internal quotation marks omitted)).